UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

PROTO LABS, INC.,                           CIVIL NO. 15-2562 (SRN/JSM)

     Plaintiff,

v.                                          <u>REPORT AND RECOMMENDATION</u>

ICO PRODUCTS, LLC,

     Defendant.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came before the undersigned United States Magistrate Judge upon ICO Products, LLC's Motion to Dismiss [Docket No. 7].  Jeffrey Shewchuk, Esq. appeared on behalf of plaintiff Proto Labs, Inc.  Thomas Leach, III, Esq. appeared on behalf of defendant ICO Products, LLC.

The matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

I.    **FACTUAL BACKGROUND**

A.    <u>**Introduction**</u>

This is a patent infringement case brought by plaintiff Proto Labs, Inc. ("Proto Labs") against defendant ICO Products, LLC ("ICO"), alleging that ICO infringed four patents issued to Proto Labs between 2004 and 2010 (collectively, "Patents-in-Suit").

The four patents at issue in this litigation relate to the field of mold making—the fabrication of molds from blocks of metal for use in the manufacture of custom plastic parts.  Complaint [Docket No. 1], Ex. A (U.S. Patent No. 6,836,699) ("'699 Patent"), col. 1, l. 21-23; Ex. B (U.S. Patent No. 7,123,986) ("'986 Patent"), col. 1, l. 11-13; Ex. C

(U.S. Patent No. 7,590,466) ("'466 Patent"), col. 1, l. 27-29; Ex. D (U.S. Patent No. 7,840,443) ("'443 Patent"), col. 1, l. 34-41. Specifically, each of the patents focuses on providing automated price quotations for molds and molded parts and contemplates the use of a computer or the internet to perform a variety of functions throughout the quotation process. In general, the customer sends to the moldmaker a CAD (Computer-Aided Design) file for the mold or parts to be manufactured; the computer assesses the CAD file and the parameters of the mold or part which affect costs, and proposes modifications, if necessary, to make the part manufacturable; the customer selects and communicates other parameters that affect the cost of the mold or molded parts (e.g., number of mold cavities, surface finish and material, delivery time, quantity, budget) via a quotation form obtained on the internet; the computer calculates a quote for the mold or parts based on all of these parameters and elements; and the price quote for the mold or parts is communicated to the customer over the internet. See generally, Abstracts and Brief Summary of the Invention for Patents-in-Suit.

In one method of mold making, known as "straight pull" injection molding, the mold consists of two metal blocks, one top and one bottom. '699 Patent, col. 1, l. 33-36; '466 patent, col. 1, l. 39-41; '443 Patent, col. 1, l. 55-57. The mold blocks are machined to form a cavity in the shape of the desired part and include "shut-off" surfaces sealing the cavity when the blocks are pressed together. '699 Patent, col. 1, l. 38-41; '466 patent, col. 1, l. 43-47; '443 Patent, col. 1, l. 59-62. This cavity is filled with molten plastic. After the plastic has solidified, the metal blocks are pulled apart, leaving behind the finished part. '699 Patent, col. 1, l. 45-50; '466 patent, col. 1, l. 52-56; '443 Patent, col. 1, l. 66-col. 2, l. 1-4.

As background to the inventions, the Patents-in-Suit set out the following information. Historically, mold making required at least one face-to-face meeting between the moldmaker and the customer. '699 Patent, col. 1, l. 55-57; '986 Patent, col. 1, l. 29-31; '466 Patent, col. 1, l. 61-63; '443 Patent, col. 2, l. 9-11. During this meeting, the customer specified the function and shape of the part (also known as the "part geometry" or "part surface profile"), typically with the aid of drawings, and the moldmaker called upon his knowledge of injection molding technology to design a mold that conformed to the customer's specifications. '699 Patent, col. 1, l. 57-62; '986 Patent, col. 1, l. 26-29, 31-34; '466 Patent, col. 1, l. 63-67; '443 Patent, col. 2, l. 11-15. Throughout this process, the moldmaker made various design choices regarding the geometric details of the cavities to be machined and the tools to be used for machining. '699 Patent, col. 2, l. 17-20; '466 Patent, col. 2, l. 22-25; '443 Patent, col. 2, l. 37-40.

Designing a mold from a customer's drawing required considerable skill and experience on the part of the moldmaker, who often suggested changes to a customer's design to reduce costs or to make the proposed mold easier to manufacture. '699 Patent, col. 2, l. 21-26; '466 Patent, col. 2, l. 26-30; '443 Patent, col. 3, l. 8-14. Due to the numerous technical decisions required to visually analyze the geometry of a part from a customer's drawing, obtaining an injection mold has historically been an expensive and lengthy process. '699 Patent, col. 2, l. 31-36; '466 Patent, col. 2, l. 36-40; '443 Patent, col. 3, l. 20-24.

In recent years, much of the mold-making process has been automated through the use of computers, thereby reducing the cost and time needed to create a mold or molded part. '986 Patent, col. 1, l. 34-43 (citing '699 Patent) (other citations omitted).

Today, most customers prepare their drawings using CAD software.  '699 Patent, col. 2, l. 40-43; '466 Patent, col. 2, l. 45-48; '443 Patent, col. 3, l. 33-35.  To produce drawings of molds based on a customer's design specifications, moldmakers also use CAD software, including programs specifically designed for this purpose.  '699 Patent, col. 2, l. 43-46; '466 Patent, col. 2, l. 48-51; '443 Patent, col. 3, l. 35-38.  Additionally, most molds are manufactured not by hand, but with the use of CNC (Computer Numerical Control) machines.  '699 Patent, col. 2, l. 46-50; '466 Patent, col. 2, l. 51-55; '443 Patent, col. 3, l. 38-42.  The CNC machines are installed with CAM (Computer-Aided Manufacturing) software, including programs developed specifically for the mold-making industry.  '699 Patent, col. 2, l. 48-56; '466 Patent, col. 2, l. 51-61; '443 Patent, col. 3, l. 38-49.

### B.   The Patents-in-Suit

#### 1.   The '699 Patent

On December 28, 2004, Proto Labs was issued the '699 Patent" entitled "Automated Quoting of Molds and Molded Parts."[1]  Complaint, ¶ 7.

According to the specification, the '699 Patent covers a method and system of automated, custom price quotation for the manufacture of a mold or a molded part.  '699 Patent, col. 4, l. 29-32.  To begin the process, a customer submits a CAD file to the mold manufacturer via the internet or a physical computer disk.  Id., col. 4, l. 32-34; col. 5, l. 49-50.  The customer's CAD file completely defines the geometry of the desired part.  Id., col. 6, l. 1.

---

[1]     At the time, Proto Labs was known as The Protomold Company, Inc.  In 2007, The Protomold Company, Inc. changed its name to Proto Labs, Inc.  Complaint, ¶¶ 7, 15.  According to the Complaint, Proto Labs is the owner of the entire right, title and interest in and to the '699 Patent and '986 Patent.  Id.

Next, a "Geometry Analyzer Module" assesses the shape of the part using a set of acceptability criteria to determine if the part can be fabricated inexpensively within the software and manufacturing capabilities of the moldmaker.  Id., col 6, l. 2-8.  In particular, the module automatically identifies whether the part can be manufactured using straight pull molding and determines the best orientation of the part for the straight pull process.  Id., col. 6, l. 20-22, 54-57.  If the straight pull assessment fails, the system provides a graphical image of the part in an orientation that comes closest to passing the assessment and suggests changes to the part geometry to allow it to pass straight pull criteria.  Id., col. 7, l. 5-13.

A second acceptability criterion is whether the mold can be created with a standard set of CNC machining tools.  Id., col. 7, l. 29-36.  If the CNC machining criterion fails, for example, due to the part having too deep of grooves, the customer is informed of this fact.  Id., col. 8, l. 38-41.

Additional acceptability criteria could be included in the Geometry Analyzer Module, such as whether the mold can be manufactured from aluminum (thus reducing costs), or whether the desired part can be molded using the plastic material selected by the customer.  Id., col. 8, l. 47-50, 53-59; col. 9, l. 19-23, 31.

If the customer's CAD file fails an acceptability criterion, the failure is communicated to the customer via a phone call or an automatically generated computer message, such as an email, describing the nature of the failure.  Id., col. 9, l. 38-45.  Additionally, the system includes a "Proposed Modification CAD File Communication Module."  This module stores information regarding the way in which the desired part fails acceptability criteria and generates a proposed modified CAD file that passes all

criteria.  Id., col. 9, l. 44-51, 59-64.   The proposed modified CAD file is then automatically transmitted to the customer.  Id., col. 10, l. 20-24.  The present invention provides "a computerized method for fast identification of the mold manufacturability issues."  Id., col. 10, l. 43-45.

The next part of the invention is the Quoting Module.  "If desired, quoting [a price] may be performed the prior art way, by having an experienced moldmaker review drawings of the customer's part and meticulously consider what may be involved in making the mold.   More preferably however, the Quoting Module automatically generates a quotation for the mold, and transmits the automatically-generated quotation to the customer."  Id., col 10, l. 61-67.  To automatically generate a quotation, the Quoting Module assesses one or more cost-affecting parameters such as the size of the desired part, the depth and angle of grooves and corners, and the amount of time it will take the CNC mill to machine the mold.  Id., col. 11, l. 1-3; col. 12, l. 10-11, 16-23.  The customer is then presented with one or more computerized drop-down menus of cost-affecting options.  Id., col. 13, l. 17-22.  For example, the customer may select the number of cavities to be formed within a single mold block.  Id., col. 13, l. 62 to col. 14, l. 8.

The next part of the invention is the "Tool Selection and Tool Path Computation Module."  Id., col. 16, l. 15-16.  Once the Module determines what tools and tool paths should be used to most efficiently manufacture the mold, a "CNC Instruction Generation Module" formulates a set of instructions for the CNC mills to machine the mold from a raw block of metal.  Id., col. 16, l. 21-25; col. 19, l. 42-48.

The final step involves machining the mold using the set of CNC machining instructions generated in the previous step.  Id., col. 19, 63-64.

A flow diagram of the entire process is shown below:



Id. at Fig. 2; see also id., col. 4, l. 50-52 ("FIG. 2 is a flow diagram of the preferred method followed by the present invention to manufacture the mold for the exemplary 'cam' part.").

The '699 Patent includes the following claims:

1.   A method of automated, custom quotation for manufacture of a mold and/or manufacture of a molded part, the mold defining a cavity corresponding in shape to the part to be molded, the method comprising:

receiving a CAD file for the part to be molded, the CAD file defining a part surface profile;

assessing cost-affecting parameters of mold manufacture and/or part manufacture determined by the part surface profile;

providing the customer with at least one menu of customer-selectable values for a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile;

allowing the customer to select one of the provided customer-selectable values;

automatically generating a quotation for mold manufacture and/or part manufacture based in part upon the cost-affecting parameters determined by part surface profile and based in part upon the customer-selected value; and

automatically transmitting the automatically generated quotation to the customer.

2.   The method of claim 1, wherein the CAD file is received directly from the customer.

3.   The method of claim 1, wherein the at least one menu of customer-selectable values for a cost-affecting parameter or mold manufacture and/or part manufacture unassociated with part surface profile comprises a menu of possible number of cavities in the mold, such that the automatically generated quotation varies based upon how many cavities the customer selects for the part.

4.  The method of claim 1, wherein at least one menu of customer-selectable values for a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile comprises a menu of available injection moldable plastics, such that the automatically generated quotation varies based upon which plastic the customer selects for the part.

5.  The method of claim 1, wherein at least one menu of customer-selectable values for a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile comprises a menu of possible surface finishes, such that the automatically generated quotation varies based upon which surface finish the customer selects for the part.

6.  The method of claim 1, wherein at least one menu of customer-selectable values for a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile comprises a menu of number of parts in a production run, such that the automatically generated quotation non-linearly varies based upon how many parts the customer selects to be run.

7.  The method of claim 1, wherein the automatically generated quotation comprises a series of piece price quotations covering different lot sizes, the series of piece price quotations varying non-linearly based upon how many parts the customer selects to be run.

8.  The method of claim 1, wherein at least one menu of customer-selectable values for a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile comprises a menu of potential delivery times, such that the automatically generated quotation non-linearly varies based upon lead time required by the customer.

9.  The method of claim 1, further comprising:

    automatically determining physical geometry modification locations for the CAD file on the part to be molded;

    creating a proposed modification CAD file which highlights the physical geometry modification locations relative to remaining unaltered portions of the part surface profile,

wherein the automatically generated quotation is based upon the proposed modification CAD file; and

transmitting a rendering of the proposed modification CAD file to the customer together with the automatically generated quotation.

10. The method of claim 1, wherein the act of assessing cost-affecting parameters determined by the part surface profile comprises:

computer generating a series of CNC machining instructions corresponding to machining the mold to match the part surface profile, wherein the automatically generated quotation is based upon the computed CNC machining instructions.

11. The method of claim 1, wherein the act of assessing cost-affecting parameters determined by the part surface profile comprises:

determining a parting line and corresponding shutoff surfaces between separable portions of the mold, wherein the automatically generated quotation varies based upon complexity of the parting line and corresponding shutoff surfaces.

12. The method of claim 1, wherein the act of assessing cost-affecting parameters determined by the part surface profile comprises:

automatically identifying an estimated duration of material removal required for each discrete portion of the part surface profile, and wherein the automatically generated quotation varies based upon a total of estimated durations of material removal.

13. The method of claim 1, wherein the act of assessing cost-affecting parameters determined by the part surface profile comprises:

automatically identifying the number and type of tools to be used in selected material removal steps for the mold, and wherein the automatically generated quotation varies based upon the number and type of tools to be used in selected material removal steps for the mold.

14.    The method of claim 1, wherein the act of assessing cost-affecting parameters determined by the part surface profile comprises automatically assessing mold block area required for the part, and wherein the automatically generated quotation varies based upon required mold block area.

15.    The method of claim 1, wherein the act of assessing cost-affecting parameters determined by the part surface profile comprises automatically assessing amount, depth and steepness of ribbing required for the part, and wherein the automatically generated quotation varies based upon the required amount, depth and steepness of ribbing.

16.    The method of claim 1, wherein the customer is provided with at least one menu of customer-selectable values on an internet web page.

17.    A method of automated, custom quotation for manufacture of a mold and/or manufacture of a molded part; the mold defining a cavity corresponding in shape to the part to be molded, the method comprising:

receiving a CAD file for the part to be molded, the CAD file defining a part surface profile;

automatically determining physical geometry modification locations for the CAD file on the part to be molded;

creating a proposed modification CAD file which highlights the physical geometry modification locations relative to remaining unaltered portions of the part surface profile,

automatically generating a quotation for mold manufacture and/or part manufacture based at least in part upon the cost-affecting parameters determined by part surface profile as modified in the proposed modification CAD file; and

transmitting a rendering of the proposed modification CAD file to the customer together with the automatically generated quotation.

18.    A system for automated, custom quotation for manufacture of a mold and/or manufacture of a molded part; the mold defining a cavity corresponding in shape to the part to be molded, the system comprising:

an address configured to receive a CAD file from a customer for the part to be molded, the CAD file defining a part surface profile; and

one or more processors collectively programmed for:

providing the customer with an internet page supplying at least one menu of customer-selectable values for a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile;

automatically generating a quotation for mold manufacture and/or part manufacture based in part upon the cost-affecting parameters determined by part surface profile and based in part upon the customer-selected value; and

automatically transmitting the automatically generated quotation to the customer over the internet.

19.    A method of automated, custom quotation for manufacture of a mold and/or manufacture of a molded part, the mold defining a cavity corresponding in shape to the part to be molded, the method comprising:

receiving a CAD file for the part to be molded, the CAD file defining a part surface profile; assessing cost-affecting parameters of mold manufacture and/or part manufacture determined by the part surface profile;

receiving additional information from the customer impacting upon a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile;

automatically generating a quotation for mold manufacture and/or part manufacture based in part upon the cost-affecting parameters determined by part surface profile and based in part upon the additional information received; and

automatically transmitting the automatically generated quotation to the customer.

20.    A system for automated, custom quotation for manufacture of a mold and/or manufacture of a molded part; the mold defining a cavity corresponding in shape to the part to be molded, the system comprising:

an address configured to receive a CAD file from a customer for the part to be molded, the CAD file defining a part surface profile; and

one or more processors collectively programmed for:

assessing cost-affecting parameters of mold manufacture and/part manufacture determined by the part surface profile;

automatically generating a quotation for mold manufacture and/or part manufacture based in part upon the cost-affecting parameters determined by part surface profile and based in part upon additional information received from the customer impacting upon a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile; and

automatically transmitting the automatically generated quotation to the customer over the internet.

Id., col. 20, l. 35 to col. 24, l. 17.

## 2.    The '986 Patent

On October 17, 2006, Proto Labs was issued the '986 Patent entitled "Family Molding."   Complaint, ¶ 15.   The '986 Patent describes "a method and system of automated, custom quotation for manufacture of a mold and/or the manufacture of two or more molded parts."  '986 Patent, col. 1, l. 52-54.   Similar to the '699 Patent, the process described in the '986 Patent begins with the customer providing a CAD file defining the geometry and function of each part to be molded.  Id., col. 1, l. 54-60; col. 3, l. 11-13.

In the next step, a "Customer Data Input Module" displays an electronic form that allows the customer to select options affecting the entire "family" of parts, such as the material used, the estimated delivery date, the number of parts to be molded, or the surface finish.  Id., col. 3, l. 22-28 (citing id., Fig. 4), 43-46; col. 4, l. 53-56; col. 5, 12-14,

21-26.   After the form is completed, the customer can choose either to finalize a quotation or to add another part to the family.  Id., col. 5, l. 51-54.

Following this step, the customer's CAD files are sent to the Geometry Analyzer Module, which assesses each file using a set of acceptability criteria.  Id., col. 5, l. 54-57; col. 6, l. 11-18.  If a CAD file fails one or more acceptability criteria, this failure is relayed to the customer through an automatically generated computer message.  Id., col. 6, l. 22-29.  The Proposed Modification CAD File Communication Module then displays a graphical rendering of the part, highlighting the areas that failed at least one acceptability criterion.  Id., col. 6, l. 31-36.

Once the customer's CAD files have passed all acceptability criteria, the "Family Quote Adjustment Module" determines whether manufacturing all of the parts as a family will result in a cost savings.  Id., col. 6, l. 46-51.  This involves assessing whether multiple parts can be run in a single, multiple-cavity mold, and calculating the fewest number of mold blocks necessary to manufacture the family of parts.  Id., col. 6, l. 52-53, 59-62.  The Family Quote Adjustment Module operates in coordination with the Quoting Module to generate a price quotation for the family of parts.  Id., col. 8, l. 26-28. The Quoting Module automatically transmits the quotation to the customer, preferably through the internet.  Id., col. 8, l. 40-44.

A flow chart of the entire process is shown below:



Id., Fig. 3; see also id., col. 2, I. 8-9 ("FIG. 3 is a flow chart of preferred software of the present invention.").

The '986 Patent contains 24 claims:

1.    A method of manufacturing a mold for two or more parts, the method comprising:

      receiving customer part data comprising a CAD file for a first part to be molded, the CAD file defining a first part surface profile;

      receiving customer part data comprising a CAD file for a second part to be molded, the CAD file defining a second part surface profile;

      automatically determining that the first part and the second part are eligible for molding in a family mold, the automatic determining requiring both the first part and the second part to be molded of the same material and requiring that a cavity for the first part and a cavity for the second part fit within a single mold block size;

      machining, within a single mold block, the cavity for the first part based upon the CAD file defining the first part surface profile and the cavity for the second part based upon the CAD file defining the second part surface profile; and

      running the single mold block in an injection mold press to manufacture the first part and the second part.

2.    The method of claim 1, further comprising: automatically determining that the first part is to be run in a different quantity from the second part; and adding a shut-off valve to the single mold block.

3.    The method of claim 1, further comprising: automatically determining that the first part is to be run in a higher quantity than the second part; and machining a second cavity for the first part in the single mold block, such that the single mold block comprises at least two cavities for the first part and a cavity for the second part.

4.    The method of claim 1, further comprising: machining the cavity for the first part with a first tool; prior to completion of machining the cavity for the first part, machining the cavity for the second part with the first tool without a tool change.

5.    A method of custom quotation for manufacture of a mold and/or manufacture of two or more parts, the method comprising:

receiving customer part data comprising a CAD file for a first part to be molded, the CAD file defining a first part surface profile;

receiving customer part data comprising a CAD file for a second part to be molded, the CAD file defining a second part surface profile;

assessing cost-affecting parameters of mold manufacture and/or part manufacture determined by the first part surface profile and by the second part surface, the assessment including an automated determination that the first part and the second part are eligible for molding in a family mold; and

generating a quotation for mold manufacture and/or part manufacture for the first part, for the second part or for both the first and second parts, the quotation based at least in part upon the cost-affecting parameters determined by the first part surface profile, the second part surface profile, or both the first and second part surface profiles, the quotation including an adjustment if the first part and the second part are eligible for molding in the family mold differing.

6.    The method of claim 5, wherein the customer part data for the first part to be molded comprises a customer indication of material for molding of the first part, wherein the customer part data for the second part to be molded comprises a customer indication of material for molding of the second part, and wherein the automated determination that the first part and the second part are eligible for molding in a family mold comprises an automated verification that the first part and the second part are to be molded from the same material.

7.    The method of claim 6, further comprising:

providing the customer with a menu of available injection moldable plastics from which the customer makes a selection of plastic for the parts, and wherein the quotation varies based upon which plastic the customer selects for the parts.

8.    The method of claim 5, wherein the automated determination that the first part and the second part are eligible for molding in a family mold comprises an automated assessment of whether a cavity for the first part and a cavity for the second part fit into a standard mold block size.

9. The method of claim 5, wherein the customer part data for the first part to be molded comprises a customer indication of quantity for molding of the first part, wherein the customer part data for the second part to be molded comprises a customer indication of quantity for molding of the second part, and wherein the automated determination that the first part and the second part are eligible for molding in a family mold comprises a verification that the first part is to be run in the same quantity as the second part.

10. The method of claim 5, further comprising:

determining that the first part is to be run in a different quantity from the second part; and adding a cost of a gate shut-off valve to the quotation.

11. The method of claim 5, further comprising:

providing the customer with an opportunity to include more than two parts in the family mold quotation, the assessment including an automated determination that all the customer included parts are eligible for molding in a single family mold.

12. The method of claim 5, wherein generating the quotation comprises assessing manufacturing set-up costs and adjusting the quotation when manufacturing set-up costs are shared by the two or more parts.

13. The method of claim 5, further comprising:

communicating the quotation to the customer via computer.

14. The method of claim 5, wherein generating the quotation for molding the first part and the second part in the family mold comprises:

identifying tooling for machining a cavity for the first part and for machining a cavity for the second part;

assessing whether one or more tools identified for machining the cavity for the first part are identical to one or more tools identified for machining the cavity for the second part: and

if identical tooling is identified, adjusting the quotation for reduced tool change costs.

15. The method of claim 5, wherein generating the quotation for molding the first part and the second part in the family mold comprises:

identifying surfaces finishes for a cavity the first part and a cavity for the second part; assessing whether at least one identified surface finish for the cavity for the first part is identical to at least one identified surface finish for the cavity for the second part; and

if at least one identical surface finish is present, adjusting the quotation for reduced surface finishing costs.

16. The method of claim 5, further comprising:

upon acceptance of the quotation by the customer, machining multiple cavities into a mold block corresponding in shape to the parts to be molded as defined by the customer's CAD files.

17. The method of claim 16, wherein a first tool is used on a first cavity for the first part and on a second cavity for the second part prior to using a second tool on the first cavity for the first part.

18. A method of custom quotation for manufacture of a mold and/or manufacture of two or more parts, the method comprising:

receiving customer part data comprising a CAD file for a first part to be molded, the CAD file defining a first part surface profile

automatically querying the customer as to whether the first part is to be molded as part of a family;

if the customer responds that the first part is to be molded as part of a family, receiving customer part data comprising a CAD file for a second part to be molded, the CAD file defining a second part surface profile;

assessing cost-affecting parameters of mold manufacture and/or part manufacture determined by the first part surface profile and by the second part surface profile; and

generating a quotation for mold manufacture and/or part manufacture for the first part, for the second part or for both the first and second parts, the quotation based at least in

part upon the cost-affecting parameters determined by the first part surface profile, the second part surface profile, or both the first and second part surface profiles, the quotation including an adjustment if the customer has responded that the first part and the second part are to be molded as part of a family.

19.    A computer readable medium storing a computer program for custom quotation for manufacture of an injection mold and/or manufacture of two or more injection molded parts in a family, the computer program comprising:

an input dedicated for receiving a customer's CAD files, each CAD file defining a shape of a part to be molded;

computer code for analyzing the customer's CAD files to determine at least one cost-affecting parameter of injection mold manufacture, the computer code also reviewing information including material of the part to be molded to determine whether the part is eligible for running in a family mold with one or more additional other parts; and

an output providing a dollar value quotation for injection mold manufacture and/or part manufacture which includes costs associated with machining cavities into an injection mold block, the cavities corresponding in shape to the parts to be injection molded, the output based in part on the cost-affecting parameter of injection mold manufacture as determined by the computer code analysis of the customer's CAD files, the dollar value quotation being adjusted for reduced costs associated with running multiple parts in the same family mold when the computer code has determined that the part is eligible for running in the family mold with other additional parts.

20.    The computer readable medium of claim 19, wherein the computer program provides the customer with a menu of available injection moldable plastics for a first part to be molded, and automatically requires all other additional parts to be molded in the same family with the first part to be molded of the material selected by the customer for the first part.

21.    The computer readable medium of claim 19, wherein the computer code determines whether a cavity for the first part and a cavity for an additional part to be molded in the same family fit into a standard mold block size.

22.   The computer readable medium of claim 19, wherein the computer program further comprises an input for the customer to identify the number of parts to be run for the first part and the number of parts to be run for an additional part to be molded in the same family, and wherein, if different quantities are selected, the computer code increases the dollar value quotation to add a cost of a gate shut-off valve to the dollar value quotation.

23.   The computer readable medium of claim 19, wherein the reduced costs associated with running multiple parts in the same family mold are set up costs associated with running an injection mold press.

24.   The computer readable medium of claim 19, wherein the reduced costs associated with running multiple parts in the same family mold are tool change costs associated with machining a cavity for the first part and a cavity for an additional part in one mold block.

Id., col. 9, l. 63 to col. 14, l. 5.

### 3.   The '466 Patent

On September 15, 2009, Proto Labs was issued the '466 Patent" entitled

"Automated Quoting of Molds and Molded Parts."  Complaint, ¶ 22.

The '466 Patent includes the following claims:[2]

1.   A method of custom quotation for manufacture of a mold and/or manufacture of a molded part, the mold defining a cavity corresponding in shape to the part to be molded, the method comprising:

assessing a customer's CAD file via computer to determine at least one cost-affecting parameter of mold manufacture and/or part manufacture, the CAD file defining a shape of a part to be molded;

providing the customer with at least one computer menu of customer-selectable values for a cost-affecting parameter of

---

[2]   The '466 Patent is a continuation of the '699 Patent.  '466 Patent, col. 1, l. 9-11. The specification of the '466 Patent does not materially differ from that of the '699 Patent.

mold manufacture and/or part manufacture unassociated with part surface profile;

allowing the customer to select one of the provided customer-selectable values;

computer calculating a quotation for mold manufacture and/or part manufacture based in part upon the cost-affecting parameter determined by computer assessment of the customer's CAD file and based in part upon the customer-selected value; and

communicating the computer calculated quotation to the customer via computer.

2.     The method of claim 1, wherein the cost-affecting parameter is a parameter of forming a cavity in an injection mold.

3.     The method of claim 2, wherein the cost-affecting parameter is a parameter of forming a cavity in an aluminum-based injection mold block.

4.     The method of claim 3, wherein the cost-affecting parameter is a machining cost estimate of machining a cavity in an aluminum-based injection mold block.

5.     The method of claim 1, wherein the computer menu of customer-selectable values for a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile comprises a menu of available injection moldable plastics, such that the computer generated quotation varies based upon which plastic the customer selects for the part.

6.     The method of claim 1, wherein the computer menu of customer-selectable values for a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile comprises a menu of possible surface finishes, such that the computer generated quotation varies based upon which surface finish the customer selects for the part.

7.     The method of claim 1, wherein the computer menu of customer-selectable values for a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile comprises a menu of number of parts in a production run, such that the computer generated

quotation comprises a piece price which varies based upon how many parts the customer selects to be run.

8.     The method of claim 1, wherein the computer calculated quotation comprises a series of piece price quotations covering different lot sizes, the series of piece price quotations varying non-linearly based upon how many parts the customer selects to be run.

9.     The method of claim 1, wherein the computer menu of customer-selectable values for a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile comprises a menu of potential delivery times, such that the computer generated quotation non-linearly varies based upon lead time required by the customer.

10.    A method of quotation and manufacture of a mold and/or molded part, the method comprising:

assessing a customer's CAD file via computer to determine at least one cost-affecting parameter of mold manufacture and/or part manufacture, the CAD file defining a shape of a part to be molded;

computer calculating a quotation for mold manufacture and/or part manufacture based at least in part upon the cost-affecting parameter determined by computer assessment of the customer's CAD file, the quotation including costs of machining of a cavity into a mold block corresponding in shape to the part to be molded as defined by the customer's CAD file;

communicating the computer calculated quotation to the customer; and

upon acceptance of the computer calculated quotation by the customer, machining the cavity into the mold block corresponding in shape to the part to be molded as defined by the customer's CAD file.

11.    The method of claim 10, wherein the mold block is an aluminum-based injection mold block.

12.    A computer program for custom quotation for manufacture of an injection mold and/or manufacture of an injection molded part, the computer program comprising:

23

an input dedicated for receiving a customer's CAD file, the CAD file defining a shape of a part to be molded;

computer code embodied on a readable medium for analyzing the customer's CAD file to determine at least one cost-affecting parameter of injection mold manufacture; and

an output providing a dollar value quotation for injection mold manufacture and/or part manufacture which includes costs associated with machining a cavity into the injection mold, the cavity corresponding in shape to the part to be injection molded, the output based at least in part on the cost-affecting parameter of injection mold manufacture as determined by the computer code analysis of the customer's CAD file.

13.  The computer program of claim 12, further comprising:

an input dedicated for receiving information of a cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile, and wherein the output is based in part on the cost-affecting parameter of mold manufacture and/or part manufacture unassociated with part surface profile.

14.  The computer program of claim 12, wherein the input comprises an internet address configured to receive the customer's CAD file.

15.  A computer program for automated analysis of a part for conformance with acceptability criterion on injection molding of the part, the computer program comprising:

an input dedicated for receiving a customer's CAD file, the CAD file defining a shape of a part to be molded;

computer code embodied on a computer readable medium for analyzing the customer's CAD file to determine features of the part which fall within and outside of at least one injection molding acceptability criterion; and

an output providing a rendering which highlights physical geometry modification locations relative to remaining unaltered portions of the part surface profile which fall within the at least one injection molding acceptability criterion.

16.   The computer program of claim 15, wherein the injection molding acceptability criterion comprises a determination of whether the part can be manufactured in a straight pull mold.

17.   The computer program of claim 15, wherein the injection molding acceptability criterion comprises a determination of whether the part contains acceptable draft angle.

18.   The computer program of claim 15, wherein the injection molding acceptability criterion comprises a determination of whether mold geometry for the part can be formed through machining with a standard set of CNC machining tools.

19.   The computer program of claim 15, wherein the injection molding acceptability criterion comprises a determination of whether mold geometry can be formed in aluminum or in an aluminum-based alloy.

20.   The computer program of claim 15, wherein the injection molding acceptability criterion comprises a determination of whether the part is acceptably sized for injection mold manufacture.

'466 Patent, col. 20, l. 14 to col. 22, l. 45.

### 4.    The '443 Patent

On November 23, 2010, Proto Labs was issued the '443 Patent" entitled "Automated Quoting of CNC Machined Custom Molds and/or Custom Parts". Complaint, ¶ 27.  The '443 Patent specification generally describes the same quotation process used in the '699 and '466 Patents with respect to injection molded parts. However, in addition to molding, the '443 Patent applies that process to direct machining of parts on a CNC mill.

"Machining involves a subtractive process, wherein material is reamed, drilled, sawed, lathed, cut in chips or similarly removed from a larger solid block which is held or fixtured [sic] in[to] the tool."  '443 Patent, col. 2, l. 43-46.  As with mold making, directly machining a part requires considerable skill and experience on the part of the

machinist.  Id., col. 3, l. 8-10.  Although it is not as time consuming or expensive as manufacturing a mold, obtaining even a single machined part from a skilled machinist can involve significant delay and cost.  Id., col. 3, l. 27-30.

Like the other patents at issue in this case, the process described in the '443 Patent begins with a customer submitting a CAD file that completely defines the shape of the desired part, thus obviating the need for a face-to-face meeting with the moldmaker or machinist.  Id., col. 6, l. 64 to col. 7, l. 1; col. 7, l. 23.  The Geometry Analyzer Module runs the CAD file through a series of acceptability criteria.  Id., col. 7, l. 24-26.  If the desired part is to be direct machined instead of molded, the Geometry Analyzer Module determines whether the part can be machined on a three-axis CNC mill.  Id., col. 8, l. 26-33; col. 9, l. 50-56.  If the manufacturer can perform direct machining as well as molding, the Geometry Analyzer Module assesses criteria for both processes.  Id., col. 14, l. 27-29.

Once the customer's CAD file passes all acceptability criteria, the file is submitted to the Quoting Module.  Unlike in the other patents at issue, the Quoting Module of the '443 Patent features a "budget-driven" or "reverse" quotation system, wherein the customer indicates the permissible cost of the desired part, and the system presents various alternatives to the original design that stay within the customer's budget.  Id., col. 21, l. 64-65; col. 22, l. 9-12; col. 23, l. 10-12.  The customer may specify which parameters may be adjusted by the system, such as the quantity of parts, delivery date, or various aspects of the part geometry.  Id., col. 22, l. 27-35, 60-62; see also id., Fig. 15 (computer screenshot of customer interface for quotation system).  An additional feature of the Quoting Module is an algorithm that assesses the marginal

revenue or marginal profit associated with a proposed modification.  Id., col. 24, l. 23-25.  In other words, with all other factors being equal, the Quoting Module suggests modifications that result in higher profit margins before suggesting lower margin modifications.  Id., col. 24, l. 35-44.

Alternatively, instead of the customer submitting a CAD file to the moldmaker or machinist for analysis, a large portion of the software for the system, including at least the Customer Data Input Module, could be provided to the customer for download or installation on a home computer.  Id., col. 26, l. 1-6.  This alternative embodiment still involves some real-time communication to and from the moldmaker's or machinist's computer system.  Id., col. 26, l. 19-21.

The remainder of the process of the '443 Patent is similar to that of the '699, '986 and '466 Patents, which involves selecting tools and tool paths for the machining of the mold and generating machining instructions for the CNC mills.  See id., Fig. 2.

The '443 Patent contains the following claims:

1.     A method of automated, custom quotation for manufacture of a part, the method comprising:

receiving a CAD file for the part to be manufactured, the CAD file defining a part surface profile;

assessing cost-affecting parameters of CNC machining the part surface profile;

providing the customer with at least one menu of customer-selectable values for a cost-affecting parameter of manufacture unassociated with part surface profile;

allowing the customer to select one of the provided customer-selectable values;

computer generating a quotation for part manufacture based in part upon the cost-affecting parameters of CNC machining

27

the part surface profile and based in part upon the customer-selected value; and

transmitting the computer generated quotation to the customer.

2.     The method of claim 1, wherein the menu is provided over the internet and the computer generated quotation is transmitted over the internet.

3.     The method of claim 1, wherein the assessing of cost-affecting parameters for machining the part surface profile is for machining of a mold having a cavity corresponding to a shape of the part surface profile.

4.     The method of claim 1, wherein the assessing of cost-affecting parameters for machining the part surface profile is for direct total profile machining of the part from a workpiece material block.

5.     The method of claim 1, wherein the quotation comprises both direct total profile machining of one or more parts from workpiece material in low volume, and machining of a mold having a cavity corresponding to a shape of the part surface profile for higher volume.

6.     The method of claim 1, wherein the at least one menu of customer-selectable values for a cost-affecting parameter of manufacture unassociated with part surface profile comprises a menu of available materials from which the part can be made, such that the automatically generated quotation varies based upon which material the customer selects for the part.

7.     The method of claim 6, wherein the menu of available materials comprises at least one material from which the part can be total profiled machined but which is not offered for molding of the part.

8.     The method of claim 1, wherein at least one menu of customer-selectable values for a cost-affecting parameter of manufacture unassociated with part surface profile comprises a menu of possible surface finishes, such that the automatically generated quotation varies based upon which surface finish the customer selects for the part.

9.     The method of claim 1, wherein at least one menu of customer-selectable values for a cost-affecting parameter of

manufacture unassociated with part surface profile comprises a menu of number of parts in a production run, such that an average piece price varies based upon how many parts the customer selects to be run.

10.    The method of claim 1, wherein the automatically generated quotation comprises a series of piece price quotations covering different lot sizes, the an average piece price varying based upon how many parts the customer selects to be run.

11.    The method of claim 1, wherein at least one menu of customer-selectable values for a cost-affecting parameter of manufacture unassociated with part surface profile comprises a menu of potential delivery times, such that the computer generated quotation varies based upon lead time required by the customer.

12.    The method of claim 1, wherein the act of assessing cost-affecting parameters of CNC machining the part surface profile comprises: computer generating a series of CNC machining instructions corresponding to machining the part surface profile, wherein the automatically generated quotation is based upon the computed CNC machining instructions.

13.    The method of claim 1, wherein the act of assessing cost-affecting parameters of CNC machining the part surface profile comprises: automatically identifying an estimated duration of material removal required for each discrete portion of the part surface profile, and wherein the computer generated quotation varies based upon a total of estimated durations of material removal.

14.    The method of claim 1, wherein the act of assessing cost-affecting parameters of CNC machining the part surface profile comprises: computer identification of the number and type of tools to be used in selected material removal steps for the part surface profile, and wherein the automatically generated quotation varies based upon the number and type of tools to be used in selected material removal step.

15.    The method of claim 1, wherein the act of assessing cost-affecting parameters of CNC machining the part surface profile comprises computer assessment of amount, depth and steepness of ribbing required for the part, and wherein

> the automatically generated quotation varies based upon the
> required amount, depth and steepness of ribbing.

Id., col. 31, l. 12 to col. 32, l. 52.

### C.    Proto Labs' Complaint

In its Complaint, Proto Labs alleged that sometime between 2013 and 2015, ICO released its "ICOQuote" software and began providing quotations for molded parts on its website at www.icomold.com.  Complaint, ¶ 10.  According to Proto Labs, ICO had actual knowledge of the Patents-in-Suit prior to making the ICOQuote software available on its website and prior to shipping parts made in accordance with the software.  Id., ¶¶ 12, 19, 26, 33.  By making and using the ICOQuote software and method, and by inducing others to use ICOQuote, ICO infringed the Patents-in-Suit.  Id., ¶¶ 11, 18, 25, 32.

### D.    ICO's Motion to Dismiss

In lieu of answering the Complaint, ICO moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on grounds that the patent claims are ineligible for patent protection under 35 U.S.C. § 101.  [Docket No. 9].  Based on the two-step process articulated by United States Supreme Court in Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 134 S. Ct. 2347 (2014), ICO argued that the Patents-in-Suit do not claim patentable subject matter because, at step one, they are directed to the abstract idea of providing a quote for the manufacture of an article, and at step two, their claims lack any meaningful limitations.  ICO Memorandum in Support of Motion to Dismiss ("Def.'s Mem.") [Docket No. 9], pp. 13-25.

According to ICO, at Alice step one, the claims of the Patents-in-Suit recite an abstract idea because they contain nothing more than conventional business practices

used to quote almost anything and which have been used by moldmakers for years before Proto Labs obtained the Patents-in-Suit.  Id., p. 15.  Further, at step two, the claims do not contain meaningful limitations that restrict their scope to "specific, non-routine application of these abstract ideas."  Id. (citing Clear with Computers, LLC v. Dick's Sporting Goods, Inc., 21 F. Supp. 3d 758, 763 (E.D. Tex. 2014)).  In other words, the claims in the Patents-in-Suit are simply a series of steps describing how to perform the abstract idea of providing a quote, (citing Bilski v. Kappos, 561 U.S. 593, 602 (2010)), and are no different from the claims held unpatentable in Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc., 2015 WL 436160 (D. Del. Jan. 27, 2015).  Id., pp. 16-17.

As for the '986 Patent, ICO submitted that claims 1-4 of this patent are directed to the unpatentable, abstract idea of determining whether two parts can be molded together.  Id., pp. 15, 18.  According to ICO, moldmakers had been implementing this idea long before the instant patents were issued.  Id., p. 18 (citing '699 Patent, col. 16, l. 40-42).

ICO additionally maintained that the asserted claims failed at step two of the Alice inquiry because they merely recited an abstract idea implemented through generic, unspecified computer technology or insignificant extra-solution activity, all of which are insufficient to transform any of the claims into patentable subject matter.  Id., p. 19, 23-25 (citations omitted).  ICO noted that the claims did not explain how the recited computer system calculated a quote or how the process is any different from the prior art method implemented by humans.  Id., p. 20.  The fact that certain steps are performed "automatically" or have linked an abstract process to a particular

technological environment (i.e., implementation via computer), cannot render an abstract idea patent-eligible. Id., p. 22 (citations omitted).

In opposition to the motion, Proto Labs responded that the question is not whether the patent claims can be construed to fall into an abstract category, but whether the claim limitations define such an abstract idea that they do not fit the statutory definition of patentable subject matter. Plaintiff Proto Labs, Inc.'s Memorandum in Opposition to ICO's Motion to Dismiss Under Rule 12(b)(6) ("Pl.'s Mem.") [Docket No. 16], p. 11.

Proto Labs argued that the claims recited the use of real, concrete objects such as a "molded part," a "CNC machined part" or a "CNC machined mold." Id., p. 12. According to Proto Labs, these terms cannot be simplified or broadened into an abstract concept such as a "product," and to do so would be erroneous under Alice and Bilski. Id., pp. 12-14.

Proto Labs also contended that a "CAD file defining a part surface profile" is a specific, well-known and concrete concept. Id., pp. 15-16. A CAD file is a series of unintelligible codes and numbers, and although the CAD file can be converted into a drawing by a computer, the CAD file itself contains no drawings. Id., p. 16 (citing Declaration of Jeffrey D. Shewchuk in Opposition to ICO's Motion to Dismiss Under Rule 12(b)(6) ("Shewchuk Decl."), Ex. 5 (Print-out of first 25 pages and last 25 pages of a simple CAD file) [Docket No. 17-5]). Proto Labs indicated that in the past, moldmakers did not look at CAD files; they looked at drawings, and the Patents-in-Suit do not prevent ICO from visually inspecting drawings to provide a quote. Id., pp. 17-18.

Proto Labs then listed a number of claims that it believed provided sufficient limitations to render its automated quotation patents not abstract:

- "menu of customer selectable values" ('699 Patent, claims 1, 18; '986 Patent, claims 7, 20; '466 Patent, claim 1; '443 Patent, claim 1)

- "quotation for mold manufacture and/or part manufacture" ('699 Patent, claims 1-20; '986 Patent, claims 5-24; '466 Patent, claim 1-14; '443 Patent, claims 1-15)

- "molded of the same material" ('986 Patent, claim 6);

- "machining, within a single mold block, the cavity for the first part… and the cavity for the second part" ('986 Patent, claims 8, 16, 21);

- "mold block size" ('986 Patent, claims 1, 8, 21);

- "running the single mold block in an injection mold press to manufacture the first part and the second part" ('986 Patent, claim 1);

- "quotation including an adjustment" ('986 Patent, claims 5, 18, 19);

- "input dedicated" ('986 Patent, claim 19; '466 Patent, claims 12, 13, 15);

- "costs associated with machining cavities" ('986 Patent, claim 19; '466 Patent, claims 2-4, 10);

- "aluminum" ('466 Patent, claims 3, 4, 11, 19);

- "cost-affecting parameter" ('699 Patent, claims 1, 17-20; '986 Patent, claims 5, 18, 19; '466 Patent, claims 1, 10, 12);

- "injection molding acceptability criterion" ('466 Patent, claim 15);

- "physical geometry modification locations" ('699 Patent, claims 9, 17; '466 Patent, claim 15);

- "automatically" and "automated" limitations ('699 Patent, claims 1, 17-20; '986 Patent, claims 1-3, 5, 6, 8, 9, 18, 20);

- "piece price" limitations ('699 Patent, claims 7, 8);

- "shut-off valve" limitations ('986 Patent, claims 2, 10);

- "automatically determining that the first part is to be run in a higher quantity than the second part; and machining a second cavity for the first part in the single mold  block, such that the single mold block comprises at least two cavities for the first part and a cavity for the second part" ('986 Patent, claim 3);

- "machining the cavity for the first part with a first tool; prior to completion of machining the cavity for the first part, machining the cavity for the second part with the fist tool without a tool change" ('986 Patent, claims 4, 17);

- "automated assessment of whether a cavity for the first part and a cavity for the second part fit into a standard mold block size" ('986 Patent, claim 8);

- "the automated determination that the first part and the second part are eligible for molding in a family mold comprises a verification that the first part is to be run in the same quantity as the second part" ('986 Patent, claim 9);

- "gate shut-off valve" ('986 Patent, claims 10, 22)

- "an automated determination that all the customer included parts are eligible for molding in a single family mold" ('986 Patent, claim 11);

- "assessing manufacturing set-up costs and adjusting the quotation when manufacturing set-up costs are shared by the two or more parts" ('986 Patent, claim 11);

- "set-up costs" ('986 Patent, claim 23);

- "identifying tooling for machining [two cavities] and if identical tooling is identified, adjusting the quotation for reduced tool change costs" ('986 Patent, claims 14, 15, 24);

- "direct total profile machining" ('443 Patent, claims 4, 5);

- "total profile machined" ('443 Patent, claim 7);

- "computer generating a series of CNC machining instructions" ('443 Patent, claim 12);

- "automatically identifying an estimated duration of material removal required for each discrete portion of the part surface profile" ('443 Patent, claim 13);

- "computer identification of the number and type of tools to be used in selected material removal steps" ('443 Patent, claim 14);

- "computer assessment of amount, depth and steepness of ribbing" ('443 Patent, claim 15).

Id., pp. 19-21, 23-30.[3]

Further, every claim that requires providing a menu of selectable variables satisfies the machine-or-transformation test.  Id., pp. 19-20 (citing WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1348-49 (Fed. Cir. 1999)).[4]

In reply, ICO contended that the first step of the Alice test is "distilling the claims to their essential purpose to determine whether they are abstract."  ICO Products, LLC's

---

[3]      Proto Labs conceded that claim 16 of the '699 Patent, claim 14 of the '466 Patent, claim 2 of the '443 Patent, and claim 13 of the '986 Patent are dependent claims that, for purposes of analysis under Alice, stand or fall with their respective base claims. Id., pp. 41-42.

[4]      Under the machine-or-transformation test, a claimed process is patent eligible if "'(1) it is tied to a particular machine or apparatus; or (2) it transforms a particular article into a different state or thing.'"  CyberSource Corp. v. Retail Decisions, Inc., 654 F.3d 1366, 1369 (Fed. Cir. 2011) (citation omitted).  The Supreme Court has held that the machine-or-transformation test "is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101."  Bilski, 561 U.S. at 604.  However, the machine-or-transformation test "is not the sole test for deciding whether an invention is a patent-eligible 'process.'"  Id.

Reply in Support of its Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6), ("Def.'s Reply") [Docket No. 18] p. 4 (citations omitted).

ICO argued that the recitation of a "molded part" or a "CNC machined part" does not impose any meaningful limitations on the abstract idea of providing a quotation for such parts, regardless of whether the parts themselves are physical, concrete objects. Id., p. 7.  The Patents-in-Suit do not claim any specific molded part or machined part; rather, the claims are directed to a method of providing a price quote for these parts, which is an abstract idea.  Id., pp. 7-8 (citations omitted).

Further, the distinction drawn by Proto Labs between a CAD file and a CAD drawing is irrelevant, as a CAD file is simply a computer-implemented method of conveying data representing the part surface profile, something humans have done for years.  Id., p. 9-10.

ICO also maintained that the recitation of a "menu" or "quotation" does not impose meaningful limitations on the claims because using a menu merely describes the abstract idea of choosing parameters.  Id., p. 11.  As for the "machine-or-transformation test," the present invention does not "transform" the combination of a CAD file and menu-selected parameters into a quotation because these are merely conventional steps performed on a computer.  Id. (citing buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1352 (Fed. Cir. 2014)).  Further, the fact that there are numerous ways of receiving information other than through a CAD file and menu selection does not make the asserted claims any less abstract.  Id., p. 12 (citing OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d 1359, 1362-63 (Fed. Cir. 2015)).

ICO contended that the Patents-in-Suit do not describe how the computer calculates a price quotation.  Id., pp. 12-13.  Thus, Proto Labs' attempt to patent the idea of using a computer to make price quoting more efficient cannot be done under § 101, and the machine-or-transformation test, in fact, supports the conclusion that the Patents-in-Suit are invalid  Id., p. 13 (citations omitted).

As for the other numerous terms Proto Labs characterized as non-abstract, ICO argued that even if the terms have a clear and definite meaning, they present no meaningful limitations on the scope of the abstract claims of providing a price quote or determining if two parts can be molded together.  Id., p. 15.

## II.    DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face." Anderson v. Kimberly-Clark Corp., 570 F. App'x 927, 931 (Fed. Cir. 2014) (citing Ashcroft v. Iqbal, 556 U.S. 662 (2009)). "In deciding the propriety of a motion to dismiss under Rule 12(b)(6), courts take the allegations of the complaint as true and must deny the motion 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Phonometrics, Inc. v. Int'l Bus. Machines, 124 F.3d 229 (Fed. Cir. 1997) (quoting Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc., 988 F.2d 1157, 1160 (Fed. Cir. 1993)).

### A.    Law on Patent Eligibility

Patent eligibility is governed by Section 101 of the Patent Act, which provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof,

may obtain a patent therefor, subject to the conditions and requirements of this title."  35

U.S.C. § 101.   "The Supreme Court has 'long held that [§ 101] contains an important

implicit exception[:] Laws of nature, natural phenomena, and abstract ideas are not

patentable.'"  In re TLI Commc'ns LLC Patent Litig., 2016 WL 2865693, at *2 (Fed. Cir.

May 17, 2016) (quoting Ass'n for Molecular Pathology v. Myriad Genetics, Inc., 133 S.

Ct. 2107, 2116 (2013) (quoting Mayo Collaborative Servs. v. Prometheus Labs., Inc.,

132 S.Ct. 1289, 1293 (2012)); see also Mortgage Grader, Inc. v. First Choice Loan

Servs. Inc., 811 F.3d 1314, 1324 (Fed. Cir. 2016) ("There are three exceptions to §

101's broad patent-eligibility principles: 'laws of nature, physical phenomena, and

abstract ideas.'") (citation omitted).

To determine whether an invention is directed to a patent-ineligible concept, the

Supreme Court instructs the Court apply the two-part framework set forth in Mayo.

Alice, 134 S. Ct. at 2355.  The Court described this framework as follows:

> First, we determine whether the claims at issue are directed
> to one of those patent-ineligible concepts.  If so, we then
> ask, "[w]hat else is there in the claims before us?"  To
> answer that question, we consider the elements of each
> claim both individually and "as an ordered combination" to
> determine whether the additional elements "transform the
> nature of the claim" into a patent-eligible application. We
> have described step two of this analysis as a search for an
> "'inventive concept', an element or combination of elements
> that is "sufficient to ensure that the patent in practice
> amounts to significantly more than a patent upon the
> [ineligible concept] itself."

Id. (internal citations and footnote omitted).

Since Alice, the Federal Circuit has provided guidance on the various

considerations that courts should take into account at steps one and two.

> "At step one of the Alice framework, it is often useful to
> determine the breadth of the claims in order to determine

38

whether the claims extend to cover a 'fundamental ... practice long prevalent in our system....'" Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d 1363, 1369 (Fed.Cir.2015) (quoting Alice, 134 S.Ct. at 2356). But in determining whether the claims are directed to an abstract idea, we must be careful to avoid oversimplifying the claims because "[a]t some level, 'all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas,' " Alice, 134 S.Ct. at 2354 (quoting Mayo, 132 S.Ct. at 1293). Cf. Diamond v. Diehr, 450 U.S. 175, 189 n. 12, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) (cautioning that overgeneralizing claims, "if carried to its extreme, make[s] all inventions un-patentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious."). However, not every claim that recites concrete, tangible components escapes the reach of the abstract-idea inquiry. See, e.g., Alice, 134 S.Ct. at 2360 (claims that recite general-purpose computer components are nevertheless "directed to" an abstract idea); Content Extraction [& Transmission LLC v. Wells Fargo Bank, NA, 776 F.3d 1343,] 1347 (Fed. Cir. 2014) (claims reciting a "scanner" are nevertheless directed to an abstract idea); Mortg. Grader, Inc. v. First Choice Loan Serv. Inc., 811 F.3d 1314, 1324–25 (Fed.Cir.2016) (claims reciting an "interface," "network," and a "database" are nevertheless directed to an abstract idea).

\*\*\*

[The] relevant inquiry at step one is "to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." See Enfish, LLC v. Microsoft Corp., No.2015–2044, slip op. at \*11 (Fed.Cir. May 12, 2016). We contrasted claims "directed to an improvement in the functioning of a computer" with claims "simply adding conventional computer components to well-known business practices," or claims reciting "use of an abstract mathematical formula on any general purpose computer," or "a purely conventional computer implementation of a mathematical formula," or "generalized steps to be performed on a computer using conventional computer activity." Id. at \*16–17.

TLI Commc'ns, 2016 WL 2865693, at \*3.

At step two, the Federal Circuit explained:

> The transformation of an abstract idea into patent-eligible subject matter "requires more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'" [quoting Alice, 134 S.Ct. at 2357] (quoting Mayo, 132 S.Ct. at 1294) (alterations in original). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" Id. (quoting Mayo, 132 S.Ct. at 1297) (alterations in original). Those "additional features" must be more than "well-understood, routine, conventional activity." Mayo, 132 S.Ct. at 1298.

Ultramercial, Inc., 772 F.3d at 715.

Prior to and following Alice, both the Supreme Court and Federal Circuit have confronted challenges under § 101 involving the implementation and automation of a variety of business practices through such mediums as the internet, computers, and other electronic devices.   In most instances, the courts concluded that the claimed invention was directed to a patent-ineligible abstract idea and that the implementation of that idea via computer or the internet was insufficient to transform it into a patent-eligible application.   See, e.g., Gottschalk v. Benson, 409 U.S. 63, 71-72 (1972) (finding that a mathematical algorithm executed on a computer was not patent eligible); Alice, 134 S.Ct. at 2356 (holding that claims directed to the abstract idea of intermediated settlement were unpatentable, even though some of the claims required generic computer implementation); Mortgage Grader, 811 F.3d at 1324–25 (determining that claims attaching generic computer components to perform abstract concept of "anonymous loan shopping" were not patent eligible); Versata Development Group v. SAP America, Inc., 793 F.3d 1306, 1333–34 (Fed. Cir. 2015) (finding that computer performing "purely conventional" steps to carry out claims directed to "abstract idea of determining a price using organization and product group hierarchies" did not make

claims eligible under § 101); Intellectual Ventures, 792 F.3d at 1367–69 (concluding that claims adding generic computer components to method of financial budgeting were patent ineligible); OIP Techs., 788 F.3d at 1362–63 (holding that automation of methods of offer-based price optimization environment through generic computer functions was insufficient to render claims patent eligible); Content Extraction, 776 F.3d at 1347 (claims reciting abstract process of collecting data from hard-copy documents, recognizing certain information within the collected data, and storing that information in memory were deemed ineligible); Ultramercial, 772 F.3d at 714-15 (holding that computer- and internet-based implementation of abstract method for displaying an advertisement in exchange for access to copyrighted media was insufficient to transform claims into patent-eligible subject matter); buySAFE, 765 F.3d at 1351, 1354-55 (finding that a claim directed toward abstract idea of guaranteeing a party's performance in an online transaction contained no inventive concept to make claim eligible under § 101); Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.), 687 F.3d 1266, 1277 (Fed. Cir. 2012) (holding that claim for "systems and methods for administering and tracking the value of life insurance policies in separate accounts" was an abstract idea, and implementation of such idea on computer did not render claim patent eligible); CyberSource, 654 F.3d at 1372-73 (finding that a broadly worded method claim and a claim reciting a computer readable medium for executing the method claim were ineligible because the steps in the method of verifying the validity of credit card transactions over the internet, could be performed in the human mind or by a human using a pen and paper).

In each of these cases, the asserted inventions were determined to be patent-ineligible on grounds that the claims at issue recited use of an abstract idea on any general purpose computer, recited a purely conventional computer implementation of an abstract concept, or recited generalized steps to be performed on a computer using conventional computer activity.  Enfish, 2016 WL 2756255 at *7 (citations omitted); see also Versata, 793 F.3d at 1333 (explaining that the Federal Circuit had declared in other cases the inventions involving the use of a computer or the internet to be patent-ineligible because they "had merely recited commonplace business methods aimed at processing business information, applying known business processes to particular technological environments.") (citation omitted).

However, there have been a few cases when the Supreme Court and Federal Circuit determined that an invention utilizing a computer passed muster under § 101. For example, in Diamond v. Diehr, 450 U.S. 175 (1981), the Supreme Court held that a computer-implemented process for curing rubber was patent eligible even though it employed the Arrhenius equation, a well-known mathematical equation.  Because the claims were designed to solve a technological problem in "conventional industry practice," the Court found that the claims transformed the process into an inventive application of the Arrhenius equation.  Alice, 134 S. Ct. at 2358 (citing Mayo, 132 S. Ct. at 1299).  In other words, the claims were patent eligible "because they improved an existing technological process, not because they were implemented on a computer."  Id.

In DDR Holdings, the Federal Circuit held that patents directed to systems and methods of generating a composite web page that combined certain visual elements of a "host" website with content of a third-party merchant, were patent eligible.  773 F.3d at

1248.  The court found that while the claims involved a computer and the internet, they were different than other inventions utilizing these mediums found to be patent-ineligible "because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." Id., at 1257.

In Enfish, the Federal Circuit held that several patents for a "self-referential" database were not directed to an abstract idea.  2016 WL 2756255 at *1.  In contrast to other cases where the court found the inventions to be patent-ineligible, the self-referential database claimed by Enfish was "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory." Id., at *8.

In sum, all of these cases teach that "after Alice, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible. The bare fact that a computer exists in the physical rather than purely conceptual realm 'is beside the point.'" DDR Holdings, 773 F.3d at 1256 (quoting Alice, 134 S.Ct. at 2358.).

Applying the legal principles set forth in the above cases, this Court now turns to the patents at issue.

**B.    '699 Patent**

The first step of the Alice framework directs this Court to determine whether the asserted claims are directed to a patent-ineligible concept such as a law of nature, a natural phenomenon or an abstract idea.  Alice, 134 S. Ct. at 2355.

At their core, the claims of the '699 Patent are directed to a method of price quotation for the manufacture of a mold or molded part.  Claim 1, which is exemplary, recites the following steps: (1) receiving a CAD file for a customer's part design; (2) assessing cost-affecting parameters for the manufacture of a mold; (3) receiving additional cost-affecting parameters from the customer unassociated with the part surface profile; (4) automatically generating a price quotation for the mold or molded parts based on the customer's specifications; and (5) automatically transmitting the quotation to the customer.  '699 Patent, col. 20, l. 35-56.  The remaining claims recite additional cost-affecting parameters, menu options, and computer components to be used during the process of claim 1.

Applying step one of the <u>Alice</u> test, the Court finds that the asserted claims are directed to an abstract idea: providing a price quotation for the manufacture of a mold or molded part.  The process of determining a quotation for a mold based on a customer's specifications is abstract because it has "no particular concrete or tangible form or application."  <u>Versata</u>, 793 F.3d at 1333; <u>Ultramercial</u>, 772 F.3d at 715 (same).  Although the method claimed by the '699 Patent is largely performed on computers, human moldmakers have been quoting mold prices based on visual inspection of a customer's design for years.  '699 Patent, col. 1, l. 59-62.  Thus, the concept of price quotation is similar to other methods held to be patent-ineligible abstract ideas—for instance, an intermediated settlement, (<u>Alice</u>, 134 S. Ct. at 2356-57), recording and administering digital images, (<u>TLI Commc'ns</u>, 2016 WL 2865693, at *2), anonymous loan shopping, (<u>Mortgage Grader</u>, 811 F.3d at 1324), data collection and recognition, (<u>Content Extraction</u>, 776 F.3d at 1347), and offer-based price optimization, (<u>OIP</u>

<u>Technologies</u>, 788 F.3d at 1362-64)—all of which were well-known, fundamental business practices that could be performed by a human without the aid of a computer.

For example, in <u>TLI Commc'ns</u>, the asserted patent recited a method for recording and administering digital images, which entailed:

> recording images using a digital pick up unit in a telephone unit,
>
> storing the images recorded by the digital pick up unit in a digital form as digital images,
>
> transmitting data including at least the digital images and classification information to a server, wherein said classification information is prescribable by a user of the telephone unit for allocation to the digital images,
>
> receiving the data by the server,
>
> extracting classification information which characterizes the digital images from the received data, and
>
> storing the digital images in the server, said step of storing taking into consideration the classification information.

2016 WL 2865693, at *2.

In concluding at <u>Alice</u> step one that the asserted claims were abstract, the Federal Circuit noted that even though the claims required concrete, tangible components such as a telephone unit and server, the specification "d[id] not describe a new telephone, a new server, or a new physical combination of the two. . . . Put differently, the telephone unit itself [was] merely a conduit for the abstract idea of classifying an image and storing the image based on its classification." <u>Id.</u>, at *3-4.

Similarly, in this case, the '699 Patent specification does not describe a new kind of computer, CAD file or molded part.  Nor, as in <u>Enfish</u>, are the "claims are directed to an improvement to computer functionality versus being directed to an abstract idea."

TLI Commc'ns, 2016 WL 2865693, at *3.  As such, the inclusion of these concrete elements does not make the concept of price quotation any less abstract.  See Mortgage Grader, 811 F.3d at 1325 ("'The bare fact that a computer exists in the physical rather than purely conceptual realm is beside the point.'") (quoting DDR Holdings, 773 F.3d at 1256); TLI Commc'ns, 2016 WL 2865693, at *5 ("Lastly, although the claims limit the abstract idea to a particular environment . . . that does not make the claims any less abstract for the step 1 analysis.") (citation omitted).

Further, the patent is not designed to solve a known technological problem in conventional industry practice, as was the case in Diehr.  See Alice, 134 S. Ct. at 2358 (citing Diehr, 450 U.S. at 178-79, 178 n. 3).  Thus, unlike Deihr or Enfish, Proto Labs has not identified any technological problem with the prior art method of price quotation that the patent addresses, other than the fact that it was a slow and expensive process.  See '699 Patent, col. 2, l. 31-36; '466 Patent, col. 2, l. 36-40; '443 Patent, col. 3, l. 20-24.  However, "relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible."  OIP Techs., 788 F.3d at 1363 (citations omitted).

Because the claims of the '699 Patent are directed to an abstract idea, the Court moves to step two to determine if they, individually or in ordered combination, contain an "inventive concept" sufficient to transform the nature of the claims into a patent-eligible application.  Alice, 134 S. Ct. at 2357 (citation omitted).  The Court finds they do not.

First, the Court notes that the introduction of a computer into the claims does not change the analysis at step two.  Id.  "For the role of a computer in a computer-

implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'"   Content Extraction, 776 F.3d at 1347-48 (quoting Alice, 134 S. Ct. at 2359).

As the Supreme Court explained in Alice:

> The fact that a computer "necessarily exist[s] in the physical, rather than purely conceptual, realm," Brief for Petitioner 39, is beside the point. There is no dispute that a computer is a tangible system (in § 101 terms, a "machine"), or that many computer-implemented claims are formally addressed to patent-eligible subject matter. But if that were the end of the § 101 inquiry, an applicant could claim any principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept. Such a result would make the determination of patent eligibility "depend simply on the draftsman's art," Flook, supra, at 593, 98 S.Ct. 2522, thereby eviscerating the rule that "'[l]aws of nature, natural phenomena, and abstract ideas are not patentable,'" Myriad, 569 U.S., at ——, 133 S.Ct., at 2116.

134 S. Ct. at 2358-59.  Thus, the fact that the '699 Patent manages and implements the quotation process via a computer or "automatically," standing alone, does not render the asserted claims patent-eligible.

Second, addressing the claims separately, "the function performed by the computer at each step of the process is '[p]urely conventional.'"  Id., at 2359 (quoting Mayo, 132 S. Ct. at 1298 (internal quotation marks omitted).  The claims of the '699 Patent essentially specify that the steps by which the quotation process is carried out be done "automatically" in a computerized environment.  See '699 Patent, claims 3-17, 19, 20.  In other words, the "invention" claimed by the '699 Patent is nothing more than "a computerized method for fast identification of the mold manufacturability issues" wherein "mold manufacturability issues are automatically identified and communicated

to the customer." '699 Patent, col. 10, l. 43-45, 48-49.  However, "relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible."  OIP Techs., 788 F.3d at 1363 (citations omitted); see also Intellectual Ventures, 792 F.3d at 1367 ("Nor, in addressing the second step of Alice, does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept.") (citation omitted).

Further, the inclusion of the various steps of the quotation process performed by a computer, even if the step is concrete, does not make the concept of price quotation any less abstract.  For example, Proto Labs' emphasis on the difference between a CAD file (which is a long series of unintelligible numbers and codes) and a CAD drawing (which can be produced by a computer interpreting the CAD file) is a distinction without meaning.  Pl.'s Mem., pp. 20, 22.  According to Proto Labs, prior art moldmakers looked at drawings, not CAD files, and there is no evidence that a human using pen and paper can assess a CAD file.  Id., pp. 22.  However, the fact that the human mind is unable to interpret the raw bits of information contained in a CAD file is not determinative of whether the asserted claims are directed to an abstract concept.  See Content Extraction, 776 F.3d at 1347 ("CET argues that its claims are not drawn to an abstract idea because human minds are unable to process and recognize the stream of bits output by a scanner. However, the claims in Alice also required a computer that processed streams of bits, but nonetheless were found to be abstract.") (citations omitted).  "Abstract methods do not become patent-eligible machines by being clothed in computer language."  CLS Bank Int'l v. Alice Corp. Pty., 717 F.3d 1269, 1292 (Fed. Cir. 2013).

Moreover, the specification for the '699 Patent recognizes that "[t]oday, most of customer's drawings are not prepared by hand, but rather through commercially available programs referred to as CAD (Computer-Aided Design) software." '699 Patent, col. 2, l. 40-43. Additionally, the specification acknowledges that moldmakers use CAD software packages specifically designed for drawing molds based on customers' specifications. Id., col. 2, l. 43-46. Thus, the use of CAD files and CAD software to convey and interpret a customer's part design as part of the quotation process is not an inventive concept in the mold-making industry. Rather, use of a CAD file or CAD software is simply a computer-implemented method of performing steps leading up to the ultimate quotation to the customer. The recitation of the receipt, modification or transmission of a CAD file or software does not provide any meaningful limitations on the scope of the claims.

Similarly, other recited elements, such as "an [email] address configured to receive a CAD file from a customer," ('699 Patent, claim 18), or "[computer] processors collectively programmed for assessing cost-affecting parameters," ('699 Patent, claim 20), are generic computer components that do not satisfy the inventive concept requirement. See Alice, 134 S. Ct. at 2360 (holding that "data processing system," "communications controller" and "data storage unit" were "purely functional and generic" computer components); Mortgage Grader, 811 F.3d at 1324 (finding addition of "interface," "network" and "database" insufficient to satisfy inventive concept requirement).

Likewise, the recitation of a "menu of customer-selectable values," ('699 Patent claims 1, 18), is not a meaningful limitation on the scope of the claims, as a computer

menu is nothing more than an electronic means of allowing a customer to choose parameters affecting the ultimate price of the mold or molded part.

In sum, "[s]imply appending conventional steps, specified at a high level of generality," [is] not "*enough*" to supply an "'inventive concept.'" <u>Alice</u>, 134 S. Ct. at 2357 (quoting <u>Mayo</u>, 132 S.Ct., at 1300, 1297, 1294) (emphasis in <u>Alice</u>).

Finally, considered "'as an ordered combination,' the computer components of [Proto Labs'] method 'ad[d] nothing ... that is not already present when the steps are considered separately.'" <u>Alice</u>, 134 S. Ct. at 2359 (quoting <u>Mayo</u>, 132 S. Ct. at 1298). Viewed as a whole, the method claims simply recite the concept of a quotation system implemented by a generic computer.  <u>Id.</u>  (citing [<u>CLS Bank Int'l</u>], 717 F.3d at 1286 (Lourie, J., concurring) (noting that the representative method claim "lacks *any* express language to define the computer's participation") (emphasis in <u>Alice</u>).

For all of these reasons, the Court concludes that the claims of the '699 Patent, individually and as a whole, fail to add any inventive concept sufficient to transform the abstract idea of providing a quotation into a patent-eligible invention.  Accordingly, all of the '699 Patent claims are ineligible under 35 U.S.C. § 101.

### C.     <u>'466 Patent</u>

The Court finds that the claims of the '466 Patent are ineligible under § 101 for the same reasons as the '699 Patent claims.

Claim 1 of the '466 Patent recites "[a] method of custom quotation for manufacture of a mold and/or molded part[.]"  '466 Patent, col. 20, l. 15-16.  Similar to the '699 Patent claims, the method involves (1) assessing a customer's part design via a CAD file to determine cost-affecting parameters; (2) providing the customer with a

computerized menu of cost-affecting parameters unassociated with the customer's design; (3) calculating a quotation for a mold or molded part based on the CAD file and the customer's menu-selected values; and (4) communicating the quotation to the customer.  Id., col. 20, l. 19-35.  Independent claim 10 includes an additional step of machining the mold cavity upon the customer's acceptance of a quotation.  Id., col. 21, l. 10-28.  Dependent claims 2-9 recite additional cost-affecting considerations and menu-selectable options.  Id., col. 20, l. 36 to col. 21, l. 3.

Like the claims of the '699 Patent, all of these claims are directed to the abstract concept of providing a price quotation for a mold or molded part.  The recitations of a "CAD file," "computer menu" or "molded part" do not make the idea of price quotation any less abstract.

Independent claim 12 recites a "computer program" for custom quotation of a mold or molded part.  Id., col. 21, l. 31-33.  On its face, claim 12 contains concrete computer elements such as an "input" for receiving a customer's CAD file, a "computer code" embodied on a "readable medium," and an "output" based on the computer code analysis of the CAD file.  Id., col. 21, l. 34-47.  However, upon closer inspection, the claim simply recites the same method as claim 1:

> an input dedicated for receiving a customer's CAD file, the CAD file defining a shape of a part to be molded;
>
> computer code embodied on a readable medium for analyzing the customer's CAD file to determine at least one cost-affecting parameter of injection mold manufacture; and
>
> an output providing a dollar value quotation for injection mold manufacture and/or part manufacture which includes costs associated with machining a cavity into the injection mold . . . .

Id., col. 21, l. 34-43 (emphasis added).   As such, claim 12 is also directed to the abstract idea of price quotation.

Independent claim 15 recites a computer program similar to claim 12, but instead of an output providing a quotation, it recites an "output providing a rendering which highlights physical geometry modification locations relative to remaining unaltered portions of the part surface profile which fall within the at least one injection molding acceptability criterion." Id., col. 22, l. 21-25.  The purpose of this highlighted rendering is to allow the customer to see the areas of the part design that must be altered before molding (and quotation for molding) can take place.  Id., col. 7, l. 6-13; col. 9, l. 60 to col. 10, l. 13.  Therefore, even though the claimed computer program does not itself provide a quotation, the specification makes clear that the overarching purpose of the program is to facilitate the process of price quotation.

The remaining dependent claims recite additional generic computer components and acceptability criteria for the Geometry Analyzer Module.

In sum, all of the '466 Patent claims are directed to the abstract concept of providing a quotation for the manufacture of a mold or molded part.

Turning to step two of the Alice framework, the Court does not find that the claims, individually or in ordered combination, have created an "inventive concept" sufficient to transform the abstract idea of price quotation into a patentable application of that idea.  Similar to the '699 Patent, the invention claimed by the '466 Patent is merely a computerized method for fast, automatic identification of mold manufacturability issues without the need for a face-to-face meeting between the customer and the moldmaker.  Id., col. 10, l. 36-42.  As stated previously, improvements

in speed or efficiency inherent with applying an abstract idea on a computer do not satisfy the "inventive concept" requirement.  OIP Techs., 788 F.3d at 1363; Intellectual Ventures, 792 F.3d 1363, 1367 (Fed. Cir. 2015).   Further, the recited computer elements such as an "input," "computer code," "readable medium" and an "internet address" are common, generic computer components.   Consequently, the asserted claims are "not tied to any particular novel machine or apparatus, only a general purpose computer."   Ultramercial, 774 F.3d at 716.   "And adding a computer to otherwise conventional steps does not make an invention patent-eligible."   Id. (citing Alice, 134 S. Ct. at 2357).

Accordingly, all of the '466 Patent claims are ineligible under 35 U.S.C. § 101.

**D.**     **'443 Patent**

The '443 Patent claims, like the claims of the '699 and '466 Patents, recite a method of automated price quotation for the manufacture of a custom part.  However, unlike the other Patents-in-Suit, which are directed to providing quotations for molds and injection-molded parts, the '443 Patent claims are additionally aimed at providing quotations for parts that are directly machining solid blocks of material.  See '443 Patent, col. 1, l. 34-41, col. 2, l. 41-46.  The claimed process also includes a "budget-driven quotation" function, in which the customer specifies the maximum price of a custom part, and the invention "propose[s] the least intrusive modifications to the requested part without overrunning the budget."  Id., col. 22, l. 23-26.  Notwithstanding these additional features, the Court finds that the '443 Patent claims are drawn to the abstract concept of providing a quotation for the manufacture of a part.  A budget-driven quotation is nothing more than a price quotation calculated using a basic parameter

(i.e., a maximum price), and direct machining is merely another type of manufacturing process for which a quotation can be generated.  Accordingly, neither feature makes the concept of providing a quotation any less abstract.

Because the '443 Patent claims are directed to an abstract idea, they must, at step two of the Alice analysis, individually or in ordered combination, include an inventive concept to be patent-eligible.  No such inventive concept is present here.

Claim 1, the sole independent claim, recites the same computerized method of quotation as the other Patents-in-Suit, but instead of calculating the cost of manufacturing a mold, the present invention provides a quotation for a part directly machined on a CNC mill.  See id., col. 31, l. 11-28.  According to the specification, experienced human machinists, like their mold-making counterparts, have historically provided quotations for directly machined parts by assessing customers' drawings and meticulously considering what would be involved in making the part.  Id., col. 14, l. 55-58.  Thus, the claimed process does nothing more than direct the reader to apply the abstract concept of price quotation using a computer.  The remaining dependent claims recite additional cost-affecting parameters and selectable menu options, all of which could be taken into consideration by a human machinist or moldmaker applying the prior art method of price quotation.

Accordingly, the Court concludes that all of the '443 Patent claims are patent-ineligible.

### E.    '986 Patent

Claim 1 of the '986 Patent recites "[a] method of manufacturing a mold for two or more parts."  '986 Patent, col. 9, l. 63-64.  This method includes the following steps: (1)

receiving a customer's CAD file defining the surface profile for a first part to be molded; (2) receiving a CAD file for a second part to be molded; (3) automatically determining whether the first part and the second part can be molded together in a family mold; and (4) machining, within a single mold block, the cavities for the first and second parts, based upon the customer's designs.  Id., col. 9, l. 63 to col. 10, l. 16.  Dependent claims 2-4 recite additional steps including determining whether the desired parts are to be run in different quantities, machining multiple cavities for one part within the same mold block, and machining multiple parts with the same cutting tool.  Id., col. 10, l. 17-27.

Applying Alice step one, the Court finds that claims 1-4 are directed to the abstract concept of determining whether two or more parts can be molded together—an idea having no particular concrete or tangible form.  See Ultramercial, 772 F.3d at 715. The inclusion of concrete elements such as a CAD file or a molded part does not alter this determination.  Claim 1 clearly recites a "method of manufacturing a mold for two or more parts," and not a new type of molded part or combination of parts.  See TLI Communs., 2016 WL 2865693, at *3-4.

Claims 1-4 also do not contain any inventive concept sufficient to pass muster under step two of Alice.  Molding multiple parts together in a family mold to effectuate a cost savings is not a new concept in the industry, (see '699 Patent, col. 16, l. 40-46), and human moldmakers would necessarily have to determine whether two or more parts are eligible to be molded together.  Because claims 1-4 simply direct that such determination be carried out "automatically" using a computer, the claims fail to transform the abstract idea of family molding into patent-eligible material.

Independent claim 5 recites a "method of custom quotation for manufacture of a mold and/or manufacture of two or more parts," which entails (1) receiving a customer's CAD file for a first part to be molded; (2) receiving a CAD file defining a second part to be molded; (3) assessing various cost-affecting parameters including a determination of whether the two parts can be molded together; and (4) generating a quotation for the first and second parts, including an adjustment if the parts can be molded in a family mold.  Dependent claims 6-17 recite further cost-affecting parameters and customer-selectable options such as the quantity, material and surface finish of each part. Independent claim 18 recites the same quotation process as claim 5, but allows the customer to choose, prior to uploading a second CAD file, whether the first part is to be molded as part of a family.

Similar to claim 12 of the '466 Patent, independent claim 19 recites a "computer readable medium storing a computer program for custom quotation for manufacture of an injection mold and/or manufacture of two or more injection molded parts in a family." '986 Patent, col. 12, l. 26-29.  This computer system includes an "input" for receiving a customer's CAD files, a "computer code" for determining cost-affecting parameters of mold manufacture, and an "output" providing a quotation for the mold or parts based on the cost-affecting parameters.  Dependent claims 20-24 include an input for the customer to select the material of the molded parts and the number of each part to be molded, and additional cost-affecting parameters to be determined by the computer code.

As with the other Patents-in-Suit, claims 5-24 are drawn to the abstract concept of price quotation.  The claims merely instruct the user to apply that concept in a

computerized environment, and the recited computer limitations are generic, conventional computer components that add nothing to the traditional method of quotation that an experienced human moldmaker could not do.  As such, the '986 Patent is patent-ineligible.

## III.    CONCLUSION

In sum, the Court finds that all of the claims asserted in the Patents-in-Suit are directed to abstract ideas, and none of the claims contains any inventive concept sufficient to transform the claimed abstractions into patent-eligible material.  While Proto Labs may have been instrumental in the evolution of providing mold-making quotations through the world of computers, the fatal flaw of the Patents-in-Suit is that the claims simply reference the application of a computer in the multiple steps leading to the quotation.  However, computers have been used throughout the mold-making quotation process for some period of time, and none of the limitations of the Patents-in-Suit, separately or in combination, are directed to improvements in the functionality or technology of the computer, nor do they claim to solve a known technological problem in providing quotations.  Accordingly, the Patents-in-Suit are ineligible under § 101 of the Patent Act, and ICO's motion to dismiss should be granted.

## IV.    RECOMMENDATION

For the reasons set forth above, IT IS HEREBY RECOMMENDED that ICO Products, LLC's Motion to Dismiss [Docket No. 7] be **GRANTED**.


Dated:        July 13, 2016                        *s/ Janie S. Mayeron*
                                                    JANIE S. MAYERON
                                                    United States Magistrate Judge

**NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 28, 2016**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  All briefs filed under this Rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.